# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 28, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 28, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 99403-0 |
| | ) | |
| REUBEN DENIS MULAMBA, | ) | En Banc |
| | ) | |
| Petitioner. | ) | |
| | ) | Filed : April 28, 2022 |

JOHNSON, J.—This case asks whether, under the facts in this case, the prosecution was required, under *Brady v. Maryland*,[1] to turn over to the defense the jail and mental health records of the victims' mother, who was a codefendant and a State's witness. Additionally, this case involves whether a *Petrich* jury unanimity instruction was required for charges of assault of a child. *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984). At trial, a jury found Reuben Denis Mulamba guilty of first degree assault of a child, second degree assault of a child, first degree criminal mistreatment of a child, and third degree criminal mistreatment of a child.

---

[1] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Mr. Mulamba filed a timely personal restraint petition (PRP) in the Court of Appeals, arguing multiple grounds for relief, based in part on the newly obtained jail records of a trial witness. The Court of Appeals, in an unpublished, split decision, granted Mr. Mulamba's petition with respect to his claims of a *Brady* violation and a *Petrich* jury unanimity violation.

We reverse the Court of Appeals on both the *Brady* violation and the jury unanimity claims, and we remand to the Court of Appeals for further consideration of any unresolved issues.

## FACTS AND PROCEDURAL HISTORY

The trial testimony established that Mr. Mulamba and Ashly Eli met and started dating in August 2011. Beginning in November 2011, Ms. Eli and her four-year-old daughter, J., began staying in Mr. Mulamba's Ellensburg apartment. Ms. Eli's eight-year-old son, S., later joined his mother at Mr. Mulamba's apartment. Although Mr. Mulamba and Ms. Eli ended their romantic relationship, Ms. Eli and her children remained in the apartment when Ms. Eli lost her job in December 2011. Mr. Mulamba complained to Ms. Eli about the children's lack of discipline and called Ms. Eli a bad mother; his objections centered on the children's noise and J.'s tendency to wet herself.

By January 13, 2012, tensions between Mr. Mulamba and Ms. Eli had evidently escalated. Police were called after Ms. Eli and the children were barred

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

from the apartment without shoes, extra clothes, or personal belongings. Mr. Mulamba and Ms. Eli reconciled after the incident, but abuse of the children began around this time.

According to Ms. Eli, Mr. Mulamba took control of disciplining the children. His discipline included beating both children with a belt or coaxial cables, threatening to burn S. with an iron and then beating the boy with a cold iron, pinching S.'s chest (possibly with pliers), and forcing S. to run behind the car while Mr. Mulamba drove. J. also suffered severe burns to her legs that appeared to have been made by a hot iron; the burns were noted by Ms. Eli on January 29 when she asked Mr. Mulamba to bathe and treat J.'s injuries.

Ms. Eli did not meaningfully intervene in Mr. Mulamba's actions against the children before leaving Mr. Mulamba's apartment with the children on the night of January 29. After a short stay at a hotel, Ms. Eli and the children went to an emergency shelter. The shelter's supervisor contacted the police after Ms. Eli claimed her boyfriend had beaten the children. A detective interviewed Ms. Eli, but Ms. Eli would not identify Mr. Mulamba at that time. A subsequent interview with S. also failed to get a name for the boyfriend. Meanwhile, the shelter supervisor had noticed J. was in visible pain. The supervisor accompanied Ms. Eli and the children to a hospital emergency room. Doctors discovered extensive bruising on both children, plus second and third degree burns on J.'s legs with open sores,

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

which exhibited signs of rotting flesh. J. was also suffering from kidney failure. J. was airlifted to Harborview Medical Center in Seattle, and S. was transferred later—due to concerns about head and liver injuries—to the same hospital.

Child Protective Services interviewed the children; both children reported that their mother's boyfriend had beaten them. Neither child would name the boyfriend initially, claiming their mother had asked them not to identify him. Ms. Eli had been worried that Mr. Mulamba would be arrested, interrupting his college education, and that Mr. Mulamba might blame her for the abuse if he were arrested. During questioning, J. said that "Dennis [sic]" had hurt her. Report of Proceedings (RP) (Nov. 6, 2012) at 594 (Wash. Ct. App. No. 31314-0-III).[2]

Based on this investigation, Mr. Mulamba was charged with first degree assault of a child and first degree criminal mistreatment for the injuries to J., and with second degree assault of a child and second degree criminal mistreatment for S.'s injuries. The State alleged, for each count, victim vulnerability under RCW 9.94A.535(3)(b) as an aggravating factor.

Ms. Eli was also arrested and charged with assault and criminal mistreatment of the children. Originally a codefendant with Mr. Mulamba, Ms. Eli agreed to plead guilty to two counts of criminal mistreatment and to testify against

---

[2] All Report of Proceedings and Clerk's Papers cited in the majority can be found in records for *State v. Mulamba*, No. 31314-0-III (Wash. Ct. App. June 9, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/313140.ord%20amn%20opn.pdf.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

Mr. Mulamba. In exchange, the State agreed to reduce the recommended sentence from 15 years to 10 years.

In the months before and during Mr. Mulamba's trial in October 2012, Ms. Eli was incarcerated at the Kittitas County Corrections Center. Jail records indicate that she was a disruptive inmate. Jail officials cited Ms. Eli 13 times for infractions that included possession of contraband, possession of a weapon, passing notes between inmates, inappropriate language and screaming, refusing orders, escape, damaging property, resisting restraints, attempting to riot, and self-mutilation. An October 26 note written by a jail sergeant noted that Ms. Eli "'cannot be trusted'" because she "'hides, hordes [sic], and lies.'"[3] *In re Pers. Restraint of Mulamba*, No. 35087-8-III, slip op. at 12 (Wash. Ct. App. Dec. 8, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/350878_unp.pdf (quoting Suppl. Decl. of Neil M. Fox with Additional Exs. at 215 (Wash. Ct. App. No. 35087-8-III (2018)).

Ms. Eli additionally refused meals, inappropriately removed clothing, and smuggled razors into the jail (at least once admitting that the razor was intended

---

[3] Although the parties and the Court of Appeals cited only this excerpt, the full note places these comments in a context of concern for Ms. Eli's safety: "Just a thought with I/M Eli. She has had issues with sharp objects several times in the past, even before sentencing was an issue. Perhaps for the rest of her stay we just don't take a chance with her. She has proven repeatedly that she cannot be trusted by the way she hides, hordes [sic] and lies with objects that she makes unsafe (pencils, razors etc). She has stated in the past too that she has suicidal thoughts and tendencies that she is able to hide. Just a thought but I feel like she has had ample opportunity to regain these privileges and given her downward spiral in behavior I hate to continue taking chances with her self-destructive behavior." Suppl. Decl. of Neil M. Fox with Additional Exs. at 215 (Wash. Ct. App. No. 35087-8-III (2018)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

for a suicide attempt). Mental health records from the jail noted that Ms. Eli was suffering from depression and maintained suicidal ideation. Individual incidents supported this diagnosis: Ms. Eli was confined to a restraint chair and then a restraint board on September 11; Ms. Eli banged on her cell door for over an hour that same night; she refused meals and tore up an infraction notice on September 12; Ms. Eli slit her arm with a razor on October 21; she wrote a suicide note on October 23; and, after Mr. Mulamba's trial ended, Ms. Eli attempted suicide by hanging.

At trial, the State's case included testimony from Ms. Eli, both children, police officers, social workers, doctors, neighbors, teachers, and hotel clerks. The children's out-of-court statements were admitted under the child hearsay statute. Ms. Eli's testimony included her admission that she had also abused the children (although she testified that Mr. Mulamba caused the severe injuries) and that she had entered into a plea agreement with the State. On cross-examination, Ms. Eli admitted to lying to the police, to making inconsistent statements about abusing the children, and to hiding Mr. Mulamba's identity from authorities.

The defense theory was that Ms. Eli—and not Mr. Mulamba—had inflicted the severe injuries on the children. Mr. Mulamba testified that he had not assaulted the children, although he did admit to incidents of hitting and pinching the children with his hand. Noting that he and Ms. Eli had argued about discipline of the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

children, Mr. Mulamba testified that he had observed Ms. Eli hitting the children with wires. He claimed to be unaware of the children's injuries or need for medical treatment.

The jury found Mr. Mulamba guilty on the counts of first degree assault of a child as to J., second degree assault of a child as to S., and first degree criminal mistreatment as to J. The jury found Mr. Mulamba guilty of a lesser-included count of third degree criminal mistreatment as to S. For all charges, the jury found the aggravating factor of victim vulnerability.

On direct review, the Court of Appeals affirmed Mr. Mulamba's convictions and sentence. *State v. Mulamba*, No. 31314-0-III (Wash. Ct. App. June 9, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/313140.ord%20amn%20opn.pdf. He then filed a PRP in the Court of Appeals alleging (1) county staff had failed to ensure random jury selection, (2) Kittitas County was an inappropriate venue for the trial, (3) the State's failure to release Ms. Eli's jail records constituted a *Brady* violation (or represented ineffective assistance of counsel), (4) the jury failed to receive a required unanimity instruction, and (5) the trial judge committed errors in sentencing.[4]

---

[4] Of these claims, Mulamba raised only errors in sentencing—based on the jury's special verdict of victim vulnerability—on direct appeal. *Mulamba*, No. 31314-0-III, slip op. at 37.

*In re Pers. Restraint of Mulamba*, No. 99403-0

The Court of Appeals ordered a reference hearing to determine whether the actions of Kittitas County staff had interfered with the jury selection process, and the Kittitas County Superior Court found no basis supporting that claim.[5] A panel of judges then rejected Mr. Mulamba's vicinage claim but granted his petition regarding the *Brady* and unanimity claims. The Court of Appeals did not address the remaining claims. *Mulamba*, No. 35087-8-III, slip op. at 19-20.

We accepted review of the State's petition.[6]

## ANALYSIS

I.      Whether, under *Brady*, the prosecutor was required in this case to provide jail records to the defense

In his PRP to the Court of Appeals, Mr. Mulamba contended that the Kittitas County prosecutor violated his due process rights, committing a *Brady* violation by failing to provide to defense counsel Ms. Eli's jail records from the period prior to Mr. Mulamba's trial. Mr. Mulamba learned of the records after his direct appeal was final, when Ms. Eli sought to withdraw her plea and later consented to release

---

[5] The hearing found that the county's jury selection method complied with state law, the prosecutor had not interfered with the process, and no improper conduct had impacted the defendant's constitutional rights.

[6] Mr. Mulamba opposed review on multiple grounds, including the State's failure to raise *Brady* issues in its response to Mr. Mulamba's PRP, the State's failure to meet this court's standard for granting review in cases of conflict with this court's decisions under RAP 13.4(b)(1), and the State's failure to meet this court's standard for granting review following an unpublished case under RAP 13.4(b)(4). However, all issues considered by the Court of Appeals on review are properly brought before this court.

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

her records to Mr. Mulamba. The specific records constituting Mr. Mulamba's claim of a *Brady* violation are those dealing with Ms. Eli's disciplinary infractions, her possible mental health issues in jail, and a jailer's note describing Ms. Eli as untrustworthy.

A *Brady* violation occurs when a prosecutor suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Both exculpatory evidence and impeachment evidence are covered under the *Brady* rule. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). Withheld evidence need not be requested by the defense if it is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). As constitutional questions that affect a defendant's due process rights under the Sixth and Fourteenth Amendments to the United States Constitution, we review claims of *Brady* violations de novo. *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011).

*Brady* violation analysis consists of three components. First, the withheld evidence must be "favorable to the accused, either because it is exculpatory, or because it is impeaching"; second, the evidence "must have been suppressed by the State, either willfully or inadvertently"; and third, "prejudice must have ensued."

9

*In re Pers. Restraint of Mulamba*, No. 99403-0

*Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486-87, 276 P.3d 286 (2012). This third factor of prejudice is also characterized as being material to the result. Both parties agree this framework applies but disagree on the results.

Evidence is material for *Brady* purposes when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (plurality portion). Put another way, the "'reasonable probability'" standard is met when there is "a probability sufficient to undermine confidence in the outcome" of a trial. *Bagley*, 473 U.S. at 682 (plurality portion). The Court of Appeals here did reason that "'reasonable possibility'" should be the correct standard for *Brady* materiality, citing to *United States v. Goldberg*, 582 F.2d 483, 489-90 (9th Cir. 1978), for support. *Mulamba*, No. 35087-8-III, slip op. at 43. However, this standard has not been adopted by federal and Washington State courts. The *Bagley* "reasonable probability" standard instead applies.

Under "reasonable probability," a *Brady* violation does not require a finding beyond a reasonable doubt of a changed outcome if the withheld evidence had been released; *Brady* requires only a lack of confidence in that outcome. Conversely, materiality is not established when "[t]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the

10

*In re Pers. Restraint of Mulamba*, No. 99403-0

outcome of the trial." *State v. Kwan Fai Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (1986). Instead, courts are directed to look to whether "the withheld evidence would have altered at least one juror's assessment" of the overall case. *Cone v. Bell*, 556 U.S. 449, 452, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009).

Although some dispute exists on whether the withheld jail reports are "favorable" to Mr. Mulamba, we conclude those reports do have some potential impeachment value. However, the *Brady* violation is less conclusive regarding the second and third prongs of the analysis: whether the prosecutor "suppressed" the evidence and whether the evidence was "material" to determining Mr. Mulamba's guilt or innocence.

As to the second prong, the United States Supreme Court has held that a prosecutor has the duty to learn of and disclose any "favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In *Kyles*, the Court held prosecutors committed a *Brady* violation when they failed to disclose police records of eyewitness statements, statements by the informant who linked the defendant to the crime and provided most of the State's evidence, and other exculpatory evidence. The United States Supreme Court held that the prosecutor was in a position to "know what is undisclosed" by any governmental investigatory agency. *Kyles*, 514 U.S. at 437. In addition to the police, government agencies

11

*In re Pers. Restraint of Mulamba*, No. 99403-0

covered by this duty have been held to include crime labs (*State v. Davila*, 184 Wn.2d 55, 71, 357 P.3d 636 (2015)) and others within the prosecutor's office (*Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)).

Some cases have discussed limits to the prosecutor's responsibility in discovering and disclosing *Brady* evidence. The prosecution is not responsible for evidence not under its control. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991). Such evidence has been found to include information and materials held by private parties cooperating with the government (*Mullen*, 171 Wn.2d at 901) or by distant, uninvolved branches of the government (*United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993)). Courts have noted that without limitations on a prosecutor's duty to discover and disclose evidence, the *Brady* rule could "condemn the prosecution of criminal cases to a state of paralysis." *United States v. Gambino*, 835 F. Supp. 74, 95 (E.D.N.Y. 1993).

Cases involving a noninvestigative but close government functionary, like a prison or a jail, are divided on a prosecutor's duty to obtain *Brady* material. Courts have found a prosecutor to have a duty to discover and disclose evidence regarding incarcerated witnesses in cases dealing with prison incidents. *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) (holding, in a case of first degree murder within a federal prison, that the United States Attorney's Office was

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

responsible for disclosing a witness's prison file); *United States v. Burnside*, 824 F. Supp. 1215, 1254 (N.D. Ill. 1993) (holding that the prosecutor was responsible for *Brady* material known by a prison warden in a large-scale prison drug case).

Some courts have held the prosecutor has a duty to obtain records from prisons even without a direct connection between the facility and the case. In *Carriger v. Stewart*, the Ninth Circuit Court of Appeals remanded a death penalty case for a new trial when the prosecution failed to release its prime witness's Department of Corrections file to the defense. 132 F.3d 463 (9th Cir. 1997). The defendant's guilt had rested primarily on a single prosecution witness, and the court held that "the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. . . . This must include the witness's criminal record, including prison records, and any information therein which bears on credibility." *Carriger*, 132 F.3d at 479-80.

In contrast, a recent Sixth Circuit case, *Hall v. Mays*, reached an opposite conclusion. 7 F.4th 433 (6th Cir. 2021), *cert. denied*, No. 21-7186 (U.S. Apr. 25, 2022). The *Hall* court determined that a prosecutor in Tennessee had no obligation under *Brady* to obtain a witness's mental health records from the state department of corrections. Instead, the court held that the "relationship between the jailor and the prosecutor" was not "analogous" to the prosecution-police relationship, even though "both are acting under the same sovereign." *Hall*, 7 F.4th at 445. The *Hall*

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

court did imply that the situation might differ with more connection between the prosecution and the prison system but specifically noted that "incarcerating the defendant during trial, conveying a message from an inmate, or transporting the defendant and inmate-witness to trial" did not create a sufficient connection to hold the prosecutor accountable for jail records. 7 F.4th at 445.

Washington courts have not previously decided whether jail records are disclosable for *Brady* purposes. While a jail inmate's records are confidential, prosecutors have access to those records as a "criminal justice agenc[y]." RCW 70.48.100(2); RCW 43.43.705. However, the release of records to the defense may be limited without a written order from the court or the permission of the confined person. RCW 70.48.100(2)(c), (g).[7]

In this case, the State argues it should not be responsible for reports held by the jail. Such responsibility, the State argues, "would install correctional officers as criminal investigators obligated to violate detainees' privacy in their health information and to report every potentially dishonest comment or act while in custody." State's Mot. for Discr. Review at 6. Additionally, the State notes how such access by prosecutors could violate the detainees' Sixth Amendment rights to counsel simply because a detainee could not afford to post bail. Absent a showing

---

[7] When preparing to file his PRP, Mr. Mulamba requested Ms. Eli's records from the Kittitas County jail but was refused on RCW 70.48.100 grounds until Ms. Eli consented to release the records.

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

of materiality by the defense prior to releasing such information, the State argues, the confidentiality of a detainee's jail records must be protected.

Mr. Mulamba counters these arguments by insisting that the prosecution had already conceded it "was charged with knowledge of Ms. Eli's behavior [at the jail]." Answer to Mot. for Discr. Review at 10. Mr. Mulamba's strongest argument in favor of holding the prosecutor responsible for the jail records is based on one of the prosecutors visiting Ms. Eli in jail. Because a prosecutor met with Ms. Eli during the period of her bad behavior and suicide attempts, it seems arguable the State had some knowledge of her acts. This is corroborated in Ms. Eli's PRP, which claimed the prosecutor did have knowledge of her mental state and counseled her that life would improve in prison.

Although case law is somewhat contradictory on whether the State should be required to obtain exculpatory or impeaching witness material from jails, we hold that such records, under the specific facts of this case, fall under *Brady*. Washington law allows the prosecution to access jail records without confidentiality restrictions; the State thus had full access to the records that reflected Ms. Eli's known behavior. In this case, where the State designated an incarcerated individual as a witness, the State had a duty under *Brady* to disclose those jail records to the defense.

*In re Pers. Restraint of Mulamba*, No. 99403-0

This is consistent with the standard set out in the Ninth Circuit *Benn v. Lambert* case. 283 F.3d 1040 (9th Cir. 2002). There, the prosecution's witness was a jailhouse informant who had been released from incarceration and monitored by police. The Ninth Circuit, in vacating the conviction, determined the informant's acts and history were relevant *Brady* material that the prosecution should have turned over to the defense. The court held that the prosecution knew or should have known that the records were, at the least, significantly impeaching of the witness.

Here, the prosecution worked with Ms. Eli, securing her testimony before Mr. Mulamba's trial. Ms. Eli included in her PRP that a member of the prosecution team counseled her against suicide, saying prison would be better than jail. The prosecutor admitted that he met with Ms. Eli in the jail at least twice prior to Mr. Mulamba's trial, during the period when Ms. Eli was behaving badly. Police detectives interviewed Ms. Eli while she was in jail and recorded statements regarding her suicidal ideation. As was the case in *Benn*, the prosecution here had knowledge about the witness's behavior. Based on these facts, the defense should have been provided the jail records.

This conclusion does not establish a general rule or require the prosecution to turn over all jail records to the defense under all situations. The prosecution and jails do not need to expend unnecessary resources to gather *all* records of *all* incarcerated individuals, based on the possibility that an individual might testify in

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

a trial. But here, *Brady* applies to jail records where the prosecution has specifically identified an incarcerated individual as a witness *and* where the prosecution has some knowledge, actual or constructive, of records the defense should receive. The second *Brady* prong is met in this case.

The third prong inquiry is that failure to disclose constitutes reversible error where the undisclosed records are material. This *Brady* prong has used the terms "materiality" and "prejudice" interchangeably and is similar to the prejudice requirement applied to claims of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The withheld jail records are not material under *Brady* if they can be characterized as cumulative of other trial evidence. The United States Supreme Court has held that "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998).

Undisclosed evidence is cumulative except in cases where the withheld evidence actually undermines confidence in the verdict. Confidence is undermined if even "one juror might have had reasonable doubt" as to the defendant's guilt if the jury had heard the undisclosed evidence. *Stenson*, 174 Wn.2d at 493. In *Benn*,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

for example, withheld information about the prosecution's witness was held to be not cumulative when his testimony provided most of the support for the defendant's motive. The police and prosecution's knowledge of that witness's checkered history as an informant—although similar to evidence used to impeach the witness at trial—was material because of the witness's overwhelming importance to the prosecution's overall case. Similarly, in *Kyles*, the prosecution's principal source—an individual who had alerted the police to the defendant's involvement and who had produced much of the prosecution's physical evidence— was not called as a witness. Undisclosed reports on the source's shifting statements to police and possible participation in the central crime therefore were not cumulative and were held to be material. 514 U.S. at 445.

In the present case and important to the materiality factor, Ms. Eli was not the only source of evidence against Mr. Mulamba. Both of Ms. Eli's children testified as to the abuse and identified Mr. Mulamba as their abuser. S., the older child, testified that Mr. Mulamba hit him on his back and legs and described specific assaults with a heavy belt and with pliers. In addition to identifying Mr. Mulamba in court, S. was able to identify an approximate timeline of when the assaults occurred. J. was only four years old at the time of the assaults but still identified Mr. Mulamba in court and testified that he was "'[t]he guy who hurt me.'" Resp't's Br., App. 4, at 19 (alteration in original). While J. never could

*In re Pers. Restraint of Mulamba*, No. 99403-0

specifically describe being burned, she did testify that her scars were caused when Mr. Mulamba spanked her. The court admitted the children's out-of-court interviews in which both children further detailed Mr. Mulamba's abuse.

Testimony from the investigating police officers, doctors, and social workers established that Mr. Mulamba committed the assaults in the time frame alleged by the State. One doctor testified that both children showed evidence of recovering from injuries that had occurred within the previous week. According to medical testimony, the onset of J.'s kidney failure likely dated from the same period. The injuries described by the doctors also were consistent with the children's testimony. Neighbors from the apartment building where Mr. Mulamba and Ms. Eli lived testified to seeing the children sent outside in the cold—one neighbor witnessed J. crying outside while Mr. Mulamba berated her. While not conclusive of guilt, DNA (deoxyribonucleic acid) evidence tied both Mr. Mulamba and J. to an iron and a cord allegedly used to inflict the injuries.

The limited evidence presented at trial that tended to exonerate the defendant was Mr. Mulamba's own testimony, in which he shifted blame for the major assaults to Ms. Eli and admitted only to isolated incidents of slapping each child.[8] This defense is countered by the State's extensive evidence. Even if Ms. Eli's testimony were removed entirely, the remaining evidence supports the jury verdict.

---

[8] The other defense witnesses were Mr. Mulamba's parents and a university librarian.

19

*In re Pers. Restraint of Mulamba*, No. 99403-0

In contrast to the wealth of evidence indicating Mr. Mulamba's guilt, the withheld jail reports relate to Ms. Eli's bad behavior, including possible dishonesty and mental health problems. The records' relevance was to Ms. Eli's honesty and the credibility of her testimony. However, Ms. Eli's tendency to lie was not only raised on cross-examination but was a theme throughout the entire trial. Moreover, nothing in the jail records supports the defense theory that Ms. Eli committed the serious offenses against the children.

During her testimony, Ms. Eli admitted that she had lied to the police about hitting her children. She additionally admitted to delaying medical treatment for the children when she believed the police would blame her for their injuries. Ms. Eli's children's statements (both during the trial and in interviews) further supported Ms. Eli's lack of candor: neither child would initially name their abuser because Ms. Eli told them not to. She pleaded guilty to criminal mistreatment charges; the jury was informed of her plea.

As for Ms. Eli's mental health, the defense focused on Ms. Eli's "crazy" behavior throughout the trial, to the point of claiming "[c]razy Ashley [sic]" was the actual perpetrator of the abuse. RP (Nov. 9, 2012) at 1131. Neither party contested that Ms. Eli had been somewhat untruthful and may have suffered from mental illness. During closing statements, the prosecutor characterized Ms. Eli as "crazy" three times, "nuts" once, and "pea brain[ed]" once. RP (Nov. 9, 2012) at

20

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

1083, 1094. The prosecutor additionally referred to Ms. Eli as "crazy" five times when cross-examining Mr. Mulamba. RP (Nov. 8, 2012) at 958, 960, 965, 992. The defense counsel, meanwhile, used "crazy" eleven times and "nuts" seven times when referring to Ms. Eli in closing statements. RP (Nov. 9, 2012) at 1099-1131.

While the undisclosed jail records may have further impeached Ms. Eli on these issues, Ms. Eli's already heavily impeached testimony was not the only basis for the State's case against Mr. Mulamba. Testimony presented by other witnesses—particularly the child victims—provided evidence for the jury to reasonably find Mr. Mulamba guilty.

Ms. Eli's testimony did not form the sole basis for the State's case. The evidence presented at the trial was substantial and supported the jury's guilty verdict: the child victims consistently testified that Mr. Mulamba was the person who hurt them, witnesses testified to behavior and observations consistent with Mr. Mulamba committing the assaults, and medical and forensic evidence supported Mr. Mulamba's guilt. Given all of the other evidence, additional reports—especially when those reports are of questionable admissibility—of Ms. Eli's bad jailhouse behavior and depression do not undermine confidence in the jury's verdict.

*In re Pers. Restraint of Mulamba*, No. 99403-0

The undisclosed *Brady* material did not establish a reasonable probability that the trial would have turned out differently had the material been disclosed. We therefore reverse the Court of Appeals on this issue.

II.     Whether the court was required to issue a jury unanimity instruction for the child assault charges

In his PRP, Mr. Mulamba claimed that his constitutional rights under the Sixth and Fourteenth Amendments were violated when the trial court failed to include a jury unanimity instruction for the first degree child assault and second degree child assault charges. The Court of Appeals majority agreed, holding that the assaults were charged as multiple acts; the jury instructions therefore needed to include a *Petrich* instruction on the requirement of unanimity as to which specific assault constituted the charged crime. *Mulamba*, No. 35087-8-III, slip op. at 62-64. The question of jury unanimity is an issue reviewed de novo, as it implies constitutional due process rights under a challenged jury instruction. *State v. Armstrong*, 188 Wn.2d 333, 339, 394 P.3d 373 (2017); *State v. Kiser*, 87 Wn. App. 126, 129, 940 P.2d 308 (1997).

Under Washington law, criminal defendants are entitled to a unanimous verdict under article I, section 21 of the state constitution. *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). If a defendant has committed multiple alleged acts, but the State has charged that defendant with only a single count, jury unanimity must be protected. The State must either elect a single act on

22

which it will rely or instruct that jurors agree "the same underlying criminal act has been proved beyond a reasonable doubt." *Petrich*, 101 Wn.2d at 572.

Here, Mr. Mulamba argues that such a *Petrich* instruction was required at trial for the child assault charges. He claims jury instructions 13 and 17 both showed that the first possible method of committing child assault—a discrete assault—would require unanimity as to which of the many discrete acts alleged were the basis for the assault charge. As such, according to Mr. Mulamba, this is a multiple acts case governed by the holding in *Petrich*. Since no unanimity instruction was provided, he opines that the jury did not reach unanimity on a discrete assault constituting the crime.

However, *Petrich* does not apply to alternative means or continuing course of conduct crimes. No unanimity instruction is needed for cases that involve a "'continuing course of conduct.'" *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting *Petrich*, 101 Wn.2d at 571). In order for a crime to be considered a "continuing course of conduct," the defendant generally must commit the alleged acts during "only a small time frame" and as part of a single, overarching criminal act. *State v. Crane*, 116 Wn.2d 315, 330, 804 P.2d 10 (1991). A jury in such a case does not need to unanimously agree "as to each incident of assault during this short period of time" but may instead "be unanimous in its

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

determination that the conduct occurred." *Crane*, 116 Wn.2d at 330 (citing *Petrich*, 101 Wn.2d at 571). No additional instruction regarding unanimity is required.

The Court of Appeals reasoned that this case does not involve a continuing course of conduct. *Mulamba*, No. 35087-8-III, slip op. at 65. We disagree. Continuing course of conduct cases typically involve less time than the period during which the charged assaults occurred here. But the State did not charge Mr. Mulamba with a continuing course of conduct. Although the prosecutor did use the phrase "course of conduct" when discussing Mr. Mulamba's acts at sentencing, the jury was not instructed as to any such theory.

Still, the continuing course of conduct exception to jury unanimity may apply by treating child assault as an alternative means crime in which one of the allowed means includes the existence of a "pattern or practice" of harm or pain. RCW 9A.36.120(1)(b)(ii). *Petrich* jury unanimity instructions are not required in cases involving alternative means—those crimes "where the legislature has provided that the State may prove the proscribed criminal conduct in a variety of ways." *Armstrong*, 188 Wn.2d at 340 (citing *State v. Peterson*, 168 Wn.2d 763, 769, 230 P.3d 588 (2010)).

Here, Mr. Mulamba was charged with first degree assault of a child under RCW 9A.36.120 and second degree assault of a child under RCW 9A.36.130. Specifically, the relevant language in the information is

24

*In re Pers. Restraint of Mulamba*, No. 99403-0

> That on or between the dates of January 13, 2012 and January 29, 2012 . . . the defendant . . . caused substantial bodily harm and the person had previously engaged in a pattern or practice either of assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks or caused the child physical pain or agony that is equivalent to that produced by torture.

Resp't's Br., App. 1, at 1. RCW 9A.36.120(1) states that an adult is guilty of first degree assault of a child if the adult

> (a) Commits the crime of assault in the first degree . . . against the child; or
> (b) Intentionally assaults the child and either:
> (i) Recklessly inflicts great bodily harm; or
> (ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture.

Jury instruction 13 tracked the language of the statute. The only deviation was the exclusion of "either" from prong (b) prior to "recklessly." Clerk's Papers at 419. RCW 9A.36.130 (assault of a child in the second degree) has similar alternative means language to RCW 9A.36.120. Jury instruction 17—which charged the jury with finding guilt regarding child assault in the second degree—followed the statutory language of RCW 9A.36.130. If RCW 9A.36.120 and jury instruction 13 provided for an alternative means crime, RCW 9A.36.130 and jury instruction 17 do as well.

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

A statute describes an alternative means crime if it meets four factors: (1) the title of the act, (2) the presence of a clear connection between the various acts listed in the statute, (3) whether the acts in the statute "'are consistent with and not repugnant to each other,'" and (4) whether the various acts can occur in the same criminal transaction. *State v. Arndt*, 87 Wn.2d 374, 379, 553 P.2d 1328 (1976) (quoting *State v. Kosanke*, 23 Wn.2d 211, 213, 160 P.2d 541 (1945)). Both first degree and second degree child assault are characterized as alternative means crimes. *See* 13A SETH A. FINE, WASHINGTON PRACTICE: CRIMINAL LAW AND SENTENCING § 4.10, at 93-94 (3d ed. 2019).

An analysis of these factors support the categorization here of the child assault as an alternative means crime. Here, the first factor is not instructive: the title of the act—Title 9A RCW is Washington's criminal code—does not indicate whether or when assault of a child can be charged as alternative means. The second factor deals with whether "the statute defines more than one crime or whether it defines a single crime which may be committed in a number of different ways." *State v. Hennessy*, 114 Wash. 351, 356, 195 P. 211 (1921). Each statute here describes a single crime—assault of a child—which may occur in different ways. The second factor therefore weighs in favor of a finding of an alternative means crime. As for the third factor, acts are "repugnant" when "the proof of one will disprove the other." *State v. Pettit*, 74 Wash. 510, 519, 133 P. 1014 (1913). The

26

*In re Pers. Restraint of Mulamba*, No. 99403-0

acts described in RCW 9A.36.120 and RCW 9A.36.130 do not disprove each other, so the third factor weighs in favor of alternative means. The final factor is met if the acts in the statute can occur during the same crime: as different acts of assault can inhere in the same crime, this factor weighs in favor of alternative means. With three of the four factors indicating alternative means, assault of a child under RCW 9A.36.120 and RCW 9A.36.130 can be charged as alternative means crimes.

An alternative means crime requires jury unanimity only as to guilt for the crime itself. Once the State has proved beyond a reasonable doubt that the charged crime occurred, an alternative means crime achieves jury unanimity by showing "sufficient evidence" of each alternative means. Evidence is "sufficient," "if, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Owens*, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014).

In this case, the jury could find Mr. Mulamba guilty of the first degree assault by evidence that he had intentionally assaulted J. and recklessly inflicted great bodily harm, *or* intentionally assaulted J. and caused substantial bodily harm along with a pattern of prior assault, *or* intentionally assaulted J. and caused substantial bodily harm along with causing pain equivalent to torture. Under the alternative means doctrine, the State needed only to prove beyond a reasonable

27

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

doubt that the assault of a child occurred—not that each specific act of assault occurred—and there was sufficient evidence for any underlying bodily harm and pattern of assault or torture. This type of charging language is appropriate in cases where, as here, a pattern exists and an exact date cannot be established for the criminal acts.

Importantly, the assaults in this case were treated as part of an ongoing episode of assaultive acts committed in a period of less than two weeks, supporting the classification of these crimes as part of a single ongoing pattern. In *Kiser*, Division One of the Court of Appeals reasoned that a single "episode" of assaultive conduct occurred in a child assault case when the defendant had the opportunity to abuse the child for less than one month. The court noted that if there had been "more than one distinct episode of assaultive conduct during an extended charging period," a jury unanimity instruction would have been required under *Petrich*. *Kiser*, 87 Wn. App. at 130. However, because "all [of] the assaults were part of a series that continued over a relatively short time period," all possible assaultive acts were alternative means as to the same act—not multiple acts of assault—and no jury unanimity was required. *Kiser*, 87 Wn. App. at 130. The State could choose to charge individual incidents of assault of a child, or, where an exact date is uncertain but the assaults are nevertheless established, the statute allows grouping

of the incidents and treating them as a larger episode of ongoing assaultive behavior.

Here, the testimony established that Mr. Mulamba committed the acts between January 21 and January 29. Because the assaults occurred in a limited period of time, they can be considered a single "episode" or pattern of assault, and the court did not need to provide a jury unanimity instruction; the instructions allowing for a "pattern or practice" of assault sufficed. So long as the jury found Mr. Mulamba committed the assaults beyond a reasonable doubt, there was no need for election of a specific assault or unanimity on which assault constituted the crime.

Mr. Mulamba does not dispute this characterization of alternative means crimes. Instead, he insists that as charged, the crimes of assault of a child are multiple acts that require jury unanimity as to which discrete act constitutes a crime. However, Mr. Mulamba presents little support for treating the assaults as multiple acts. As alleged, the incidents took place over a matter of days. The alleged motive for the assaults—the children's supposed lack of discipline— remained the same, and a pattern of assault can be discerned.

As charged here and under the statute, first degree and second degree child assault are alternative means crimes and did not require a unanimity instruction. The jurors were instructed that they were required to agree unanimously on each

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

verdict. The child assault statutes meet the criteria required for crimes charged as alternative means and describe a form of continuous conduct in the presence of a "pattern or practice" of harm. Mr. Mulamba has not challenged the sufficiency of the State's evidence, so jury unanimity is satisfied under the instructions given.

CONCLUSION

We reverse the Court of Appeals' finding that a *Brady* violation occurred in this case and on its jury unanimity finding. We remand the remaining issues of ineffective assistance of counsel and errors in sentencing, as well as any remaining issues regarding jury selection, to the Court of Appeals.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba*, No. 99403-0

Johnson, J.

WE CONCUR:

González, C.J.

Madsen, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.

Stephens, J.

Whitener, J.

31

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

No. 99403-0

GORDON McCLOUD, J. (dissenting)—I agree with the majority's holding that "[i]n this case, where the State designated an incarcerated individual as a witness, the State had a duty under *Brady*[1] to disclose to the defense those jail records." Majority at 15. But I disagree with its conclusion that the undisclosed jail records in this case were immaterial. Those records not only show that the State's key witness had severe mental health problems that undermined her reliability but also that she had a motive to curry favor with the State that undermined her believability. In this case, which pits the credibility of the State's key witness against the credibility of the defendant, such evidence of impeachment and bias were clearly material.

I therefore respectfully dissent.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

1

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

ANALYSIS

I. The undisclosed jail records show that the State's key witness suffered deteriorating mental health and had a motive to curry favor with the prosecutor; I therefore agree with the majority that the State had a duty to disclose this favorable information

We analyze *Brady* violations the same way the United States Supreme Court does. *See State v. Davila,* 184 Wn.2d 55, 69, 357 P.3d 636 (2015); *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011). Under *Brady* and its progeny, the prosecution has a duty to disclose exculpatory or impeaching evidence concerning guilt or sentencing. 373 U.S. at 87.

As this court has explained, since the time that *Brady* was decided in 1963, "the Supreme Court [has] expanded the *Brady* rule's reach." *Mullen*, 171 Wn.2d at 894. "Favorable evidence under *Brady* now includes not only [directly] exculpatory evidence but also impeachment evidence." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)). Evidence of a witness's deteriorating mental health that could affect their ability to perceive, recall, or relate counts as impeachment evidence.[2] Evidence of a witness's motive to curry favor with the prosecutor to avoid possible criminal charges or other

---

[2] *See generally Hall v. Mays*, 7 F.4th 433, 444 (6th Cir. 2021) ("The evidence at issue here comprises prison records that document Dutton's history of mental illness, which the State concedes could impeach Dutton, so it satisfies the first element [of *Brady*]." (relief denied because records were not considered within prosecutor's control)), *cert. denied*, No. 21-7186 (U.S. Apr. 25, 2022).

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

administrative sanctions also counts as impeachment evidence.[3]  I therefore agree

with the majority that the undisclosed evidence at issue in this case was favorable

to the defense, or "exculpatory," within the meaning of *Brady*. Majority at 11.

I do take issue with the majority's suggestion (majority at 9, citing the now-

limited Supreme Court decision in *United States v. Agurs*, 427 U.S. 97, 107, 96 S.

Ct. 2392, 49 L. Ed. 2d 342 (1976)) that *Brady* obligations may be limited to

evidence requested by the defense.  Instead, it is clear that "*Brady* obligations

extend not only to evidence requested by the defense but also to favorable evidence

not specifically requested by the defense." *Mullen*, 171 Wn.2d at 894 (citing

*Agurs*, 427 U.S. at 110); *see also Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct.

1555, 131 L. Ed. 2d 490 (1995). So I still agree with the majority's conclusion that

the *Brady* obligation extends to the undisclosed impeachment and bias evidence at

issue in this case.

I also take issue with the State's position that the prosecutor need not

produce records held by other agencies that it does not necessarily control.

Instead, as this court has explained, "[t]he government must disclose not only the

evidence possessed by prosecutors but also evidence possessed by law

---

[3] *Giglio*, 405 U.S. at 154-55 (evidence of bias or interest falls within *Brady* rule-
"evidence of any understanding or agreement as to a future prosecution would be relevant
to his credibility and the jury was entitled to know of it").

3

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

enforcement as well." *Mullen,* 171 Wn.2d at 894 (citing *Kyles*, 514 U.S. at 437).

Once again, I therefore agree with the majority that "[i]n this case, where the State

designated an incarcerated individual as a witness, the State had a duty under

*Brady* to disclose those jail records to the defense." Majority at 15.

The majority's discussion of other hypothetical cases, to which *Brady* might

not extend, is dicta.[4]

II. The undisclosed jail records provide significant, noncumulative evidence of Ashly Eli's motive to curry favor with the State (classic bias evidence) and of her deteriorating mental faculties (classic impeachment evidence); in the context of this case, this favorable evidence was "material"

But I disagree with the majority's conclusion that this undisclosed, favorable

evidence was not material.

In order to determine whether evidence is material for *Brady* purposes, we

follow the United States Supreme Court in examining the evidence's relative

---

[4] It is also somewhat incomplete dicta. Over the years, many jurisdictions (in addition to the Ninth Circuit Court of Appeals, which the majority cites) have agreed that under *Brady*, the government must disclose law enforcement agency, jail, and prison records that contain information tending to undermine, impeach, or show bias of a State's witness. *E.g.*, *United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009) (police investigators); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995) (Federal Drug Administration); *United States v. Brooks*, 296 U.S. App. D.C. 219, 966 F.2d 1500, 1504 (1992) (Internal Affairs Division of police department); *United States v. Thornton*, 1 F.3d 149 (3d Cir. 1993) (Drug Enforcement Administration); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (Federal Bureau of Investigation); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (United States Post Office), *overruled on other grounds by United States v. Henry*, 749 F.2d 203, 206 (5th Cir. 1984); *Davila*, 184 Wn.2d at 71 (Washington State Crime Laboratory).

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

importance in the context of the case. *See Kyles,* 514 U.S. at 441-54 (detailed

examination of role that evidence tending to undermine the testimony of State's

key eyewitnesses and police informant, "Beanie," might have had on the outcome).

Of critical importance given the context of this case, "[w]hen the 'reliability

of a given witness may well be determinative of guilt or innocence,' nondisclosure

of evidence affecting credibility falls within this general [*Brady* disclosure] rule."

*Giglio*, 405 U.S. at 154 (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct.

1173, 3 L. Ed. 2d 1217 (1959)).

The testimony by State's witness Eli "may well [have] be[en] determinative

of guilt or innocence." Eli was the State's most important witness. Both sides

agreed that either Reuben Denis Mulamba committed the abuse or she did. As a

result, the State sought to bolster her credibility and the defense sought to

undermine it.

Eli's credibility would have been particularly susceptible to doubt if the jury

received a complete picture of her motives and actions. It was undisputed that she

committed and enabled at least some of the horrible abuse—hence, she was an

accomplice, whose testimony should properly be viewed with skepticism. *On Lee*

*v. United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952)

(witnesses who are "informers, accessories, accomplices, false friends, or any of

5

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

the other betrayals which are 'dirty business' may raise serious questions of

credibility").

The defense, however, was fighting with one hand tied behind its back.

> ### A. The undisclosed jail records showed that Eli had a motive to please the State with her testimony to avoid punishment for her new criminal conduct

First, the State failed to disclose to the defense records concerning Eli's jail

conduct. As the majority noted, Eli was cited for 13 infractions: possession of

contraband (twice), possession of a weapon (razor), mailing notes between

inmates, inappropriate language or conduct, refusing orders, nuisance activity,

escape, resisting restraints, refusing placement, attempting to riot, damaging

property, and self-mutilation. Exs. in Supp. of PRP,  Ex. 31, at 751 (Wash. Ct.

App. No. 35087-8-III (2018)). The State could have charged Eli on multiple

grounds for this conduct, such as: possession of contraband inside a jail (RCW

9A.76.140, .150), possession of a weapon inside a jail (RCW 9.94.040), resisting

restraints (RCW 9A.76.040), threatening a public servant (.180), inciting a riot

(RCW 9A.84.030), and causing damage to jail property (RCW 9A.48.090). She

thus clearly had an incentive to curry favor with the State to avoid prosecution. *See*

*United States v. Larson*, 495 F.3d 1094, 1106 (9th Cir. 2007) (individual faced

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

with serious criminal charges has an "extremely strong incentive to testify to the Government's satisfaction").

Additionally, prison officials knew of her status as a key witness in the case against Mulamba. Officers explicitly noted that her inappropriate conduct escalated around the time of trial and that she was more cooperative after receiving her plea agreement.[5] This shows that she had an incentive to curry favor with the State right at the very time of trial.

The possibility that a key witness may be subject to sanctions is always relevant impeachment material because it shows that the witness has a motive to curry favor with the State. *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 347 (1974) (trial court refused to allow defendant to cross-examine key prosecution witness about his shaky probation status and his motive to shift blame for the charged burglary and larceny to the defendant; conviction reversed due to denial of confrontation clause right); *Benn v. Lambert*, 283 F.3d 1040, 1056 (9th

---

[5] On one occasion Eli was "very uncooperative" with officers when she was being transported to a meeting with prosecutors for Mulamba's case. Exs. in Supp. of PRP, Ex. 31, at 754 (Wash. Ct. App. No. 35087-8-III (2018)). One officer noted in the days leading up to her testimony, "BE CAREFUL AROUND HER AS THE TRIAL IS COMING UP AND AFTER SHE TESTIFIES SHE MIGHT BECOME MORE AGGRESSIVE." *Id.* at 755. After signing her plea agreement for 10 years' imprisonment, it was noted that her "attitude has changed, she is more responsive and is taking meals." Suppl. Decl. of Neil M. Fox with Additional Exs. (May 16, 2018), at 145 (Wash. Ct. App. No. 35087-8-III (2018)). The deputy prosecutor had communicated directly with prison officials about how and when Eli would show up for trial. *Id.* at 183.

Cir. 2002) (ability to use drugs without fear of criminal repercussions during trial could have given motive of key witness to fabricate inculpatory information); *Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014) (defense could have argued that since key witness was still on probation at time he testified he was seeking a favor if he testified); *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) ("The need for disclosure is particularly acute where the government presents witnesses who have been granted immunity from prosecution in exchange for their testimony."). This showing of possible bias is highly relevant and admissible to impeach the witness's credibility. *State v. Orn*, 197 Wn.2d 343, 347, 482 P.3d 913 (2021).

> B. *The undisclosed jail records showed that Eli's ability to perceive, recall, and relate accurately might be compromised by her deteriorating mental health*

Second, the State failed to disclose to the defense records concerning Eli's mental health. The jail records detail the instability of Eli's mental health leading up to the trial. She was consistently refusing to eat, getting into verbal fights with other inmates, banging on her cell door for hours, verbally harassing officers, and removing her clothing in public spaces. Exs. in Supp. of PRP, Ex. 31, at 752-55 (Wash. Ct. App. No. 35087-8-III (2018)). Her jail mental health records consistently note her suicidal ideation. Suppl. Decl. of Neil M. Fox with Additional

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Exs. (June 7, 2017), at 5-11 (Wash. Ct. App. No. 35087-8-III (2018)). Her behavior included carving words into her arm with a razor and, while resisting being pinned down by several officers, yelling about "'how much fun she was having.'" Suppl. Decl. of Neil M. Fox with Additional Exs. (May 16, 2018), at 118, 216 (Wash. Ct. App. No. 35087-8-III (2018)). One note described Eli as being "off her base-line behavior and present[ing] a danger to herself with her pounding and aggressiveness." *Id.* at 117. She was also described as "quite belligerent" and "self-destructive." *Id.* at 147, 215. As the majority notes, one jail report described that "she cannot be trusted by the way she hides, hordes [sic] and lies with objects that she makes unsafe (pencils, razors[,] etc[.])." *Id.* at 215.

A witness's deteriorating mental health is certainly relevant to that witness's ability to perceive, recall, and relate information. Thus, mental health records also constitute important impeachment material. *Fuentes v. Griffin*, 829 F.3d 233, 236 (2d Cir. 2016) (psychiatric records material to impeach witness's credibility); *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991) (evidence about a prior condition of mental instability is relevant if helpful to evaluate the witness's "ability to perceive or to recall events or to testify accurately"); *Browning v. Trammell*, 717 F.3d 1092, 1105 (10th Cir. 2013) (psychiatric evaluations that

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

contained information of memory deficits and projection of blame onto others is "classic impeachment evidence").

To be sure, both parties addressed Eli's mental health at trial. Report of Proceedings (RP) (Nov. 9, 2012) at 1100, 1102 (Wash. Ct. App. 31314-0-III).[6] The defense repeatedly attempted to characterize Eli as "crazy" to discount her testimony. *See, e.g., id.* at 1130 ("[W]e are hoping that you see that the State has presented a case built upon Ashley[7] Eli. The prosecutor said this case hinge[s] upon her. And she is crazy and crazy is not reliable. It's not believable.").

But the defense had little to corroborate this argument beside the fact that Eli had shaved her head. RP (Nov. 8, 2012) at 995.

The undisclosed records are therefore highly favorable to the defense, not cumulative of evidence presented at trial, and located in records that could be introduced efficiently at a trial. When we consider the possible impact of these undisclosed mental health records along with the possible impact of the suppressed jail misconduct records cumulatively, as the United States Supreme Court directs us to do, they would likely have undermined the result of the trial even more.

---

[6] The Court of Appeals granted in part a motion to transfer documents from Mulamba's direct appeal. Notation Ruling (Mar. 16, 2017) (Wash. Court App. No. 35087-8-III (2018)). The RP references are part of the record from *State v. Mulamba*, No. 31314-0-III.

[7] The RP misspelled both Ashly's and Denis' names.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

> *C. The jail records showing bias and providing impeachment were material because credibility was crucial in this case and the information in the records was far from cumulative*

The majority concludes that the jail records, despite their bias and impeachment value, were not "material." Majority at 19.

I respectfully disagree. Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

This is not a high standard. First, the "'reasonable probability'" of a different result standard "*does not require demonstration by a preponderance* that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"; it requires only a showing that the government's evidentiary suppression "'undermines confidence in the outcome of the trial.'" *Kyles,* 514 U.S. at 434 (emphasis added) (quoting *Bagley*, 473 U.S. at 678). Second, "materiality" is not a "sufficiency of the evidence" test—the defendant only has to show that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Third, there is no additional harmless error inquiry; a showing of

11

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

materiality "necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). Fourth, as the *Kyles* Court stressed, the suppressed evidence must be considered cumulatively, not item by item, to determine whether there is a reasonable probability that it would have put even the admitted evidence in a different light. *Id.* at 436-37.

In *State v. Gregory*, this court applied these standards. 158 Wn.2d 759, 799-800, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.,* 181 Wn.2d 757, 336 P.3d 1134 (2014). The question for this court was whether the State's suppression of the fact that the main witness in a rape prosecution lied to defense counsel about recent drug use constituted reversible error. *Id.* This court concluded that the suppressed material constituted impeachment evidence concerning a key witness—so it was material.[8] *Id.* at 800.

---

[8] The lie that R.S., the key prosecution witness made, was that "R.S. told defense counsel in an interview on August 8, 2000 that her last drug use was in April 1999. However, the dependency file reveals that R.S. had a serious relapse in June 2000 and had to go into drug treatment. In addition, while R.S. told defense counsel that she did not believe the dependency court had ordered her to get drug treatment, the court, in fact, had done so." *Gregory*, 158 Wn.2d at 798.

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

It is certainly true that in that case, just as in this case, the State argued that the defense already impeached the witness in other ways at trial, so the lie to defense counsel would not have been likely to change the outcome. *Id.* at 799. The State pointed to the fact that defense counsel impeached the witness with five prior theft convictions, with evidence about false names she gave to the police, with her drug use on the day of the attack, and with inconsistencies in her statements. *Id.*

This court held that the undisclosed evidence of *Gregory*'s main witness's lie to defense counsel (denying her recent drug use) was still material: it was more recent than the other impeachment evidence, the lie occurred in the context of questioning about the case itself, and "it undercut any argument that [the witness] had reformed her old ways." *Id.*[9]

The same is true of the undisclosed jail records in this case. The records document main witness Eli's most recent, in fact contemporaneous, criminal

---

[9] Other courts have similarly concluded that evidence that could be used to impeach a *main* witness, even if that witness was already impeached, is material under the *Brady* standard. *Price*, 566 F.3d at 914 (criminal history of the prosecution's "star witness" was material to impeach credibility); *Silva v. Brown*, 416 F.3d 980, 982, 986-87 (9th Cir. 2005) (agreement not to perform psychiatric evaluation of prosecution's "star witness" material); *Carriger,* 132 F.3d at 481 (although State's key witness's status as a convicted felon was acknowledged at trial, details of his criminal record would have been material for further impeachment); *Banks v. Dretke*, 540 U.S. 668, 701-02, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) (informant status and narcotics use of witness whose testimony was "centerpiece" of penalty-phase case material); *East v. Johnson*, 123 F.3d 235, 238-40 (5th Cir. 1997) (mental status report showing "key witness for the state" had hallucinations and was mentally incompetent was material).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

conduct and deteriorating mental health; this conduct occurred in the midst of prosecution visits to Eli in jail and hence within the context of her questioning about the case itself; and this information did more than "undercut any argument that [the witness] had reformed her old ways." It was probably the clearest evidence of her inappropriate and criminal behavior, and her unreliability.

Still, one of the most important factors in *Gregory*'s materiality analysis was that "the State in closing argument *repeatedly* emphasized that the ultimate determination for the jury in this case was who was more credible" and that credibility was determinative in that he-said, she-said case. *Id* at 799-800.

Those exact same factors are present in Mulamba's case. In closing arguments, each side tried to pin blame for the children's burns on the other. And both sides pointed to the burns as the basis for the first degree assault charge involving J. RP (Nov. 9, 2012) at 1117-18, 1077.

The defense reminded the jury that Eli's DNA (deoxyribonucleic acid) had not been excluded and that Eli was the "crazy" one who burned her daughter. *Id.* at 1102. The defense's entire argument hinged on the jury disbelieving Eli's assertion that she did not commit the crimes. *See, e.g., id.* ("[the State] is relying upon [you] believing her to get his conviction"), 1103 ("[the State is] throwing a case at you that's a coin flip as he acknowledges"), 1105 ("[D]oesn't it all come together that

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

its more likely it was Ashley?"), 1106 ("her own mother did this to her"), 1107 ("there is only one crazy person that testified," "Did [J.] forget or was she simply still refusing to blame mom?"), 1111 (referring to the burns, defense said, "Again, it's hard to know when Ashley did this."), 1112 ("but as long as Ashley blamed him that's all [the State] needed"), 1113 ("I have told you someone would have to be crazy to do this. And we know she is."), 1130 ("[H]ow did [Mulamba] present versus crazy Ashley?"), 1132 ("Dennis can only come before you and tell you his side of things. We can't stop Ashley from telling herself[,] we can only pray you don't believe her.").

By contrast, much of the State's closing argument focused on bolstering Eli's credibility. *Id.* at 1084 (State suggesting that Eli is credible and that her testimony is "a real life description of how this is going down," and "It's not a matter of . . . [a] flip [of] a coin and that's it. Because the case doesn't just hinge upon Ashley Eli but yet I would submit to you there's a stream of evidence and truth that flows through her testimony."). The State argued that "[Mulamba] seared that little girl not once . . . [but] 5 times seared [J.] with this iron." *Id.* at 1075-76. The last statement the State said in its closing, and therefore the last thing the jury heard before deliberations, was "I leave you with this. Lots of talk about the iron in this case. Doesn't just hinge on Ashley. I[] told you it hinges on Ashley. Ashley

15

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

was our only witness. Absolutely. Where was Ashley when [S.] told Detective Weed and CPS [(Child Protective Services)] Supervisor Marti Miller that [Mulamba] threatened to burn him with the iron? The iron. Where was Ashley? Ashley was in jail. And what does Ashley say independently from jail? [Mulamba] would make threats to burn. That's the type of evidence you have in this case to find him guilty as charged. Thank you." *Id.* at 1133.

Once again, when we consider the possible impact of the undisclosed mental health and jail misconduct records cumulatively, as the Supreme Court directs us to do, they would likely have undermined the result of the trial even more. *Kyles,* 514 U.S. at 435 ("materiality" is not a sufficiency of the evidence test—the defendant has to show only that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

> *D. The jail records showing bias and providing impeachment evidence were material because credibility was crucial in this case, and Eli was a far more important witness than the majority admits*

The majority determined that the jail records were not material because "Ms. Eli was not the only source of evidence against Mr. Mulamba." Majority at 18. To be sure, Eli was not the "only source."

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

But she was definitely the most important source. The defense did not dispute that the children were injured or even that Mulamba inflicted some of those injuries. RP (Nov. 8, 2012) at 962 (admitting he hit the children), 969 (admitting to spanking children with belt and wire), 971, 979. The entire defense theory was that Eli committed the most severe injuries, not Mulamba. And Eli was the main witness to testify that Mulamba committed the type of injuries—the burns—that amounted to first degree assault of a child.

Specifically, at trial, when the defense attorney asked, "Dennis ever burn you?" J. responded, "No."[10] RP (Nov. 2, 2012) at 482. The son, S., similarly testified that he never saw Mulamba burn J.[11] *Id.* at 455. Mulamba also testified that he did not burn J. and he assumed Eli did it. RP (Nov. 8, 2012) at 993.

---

[10] J. also testified "[n]o" when asked if her "mommy" ever burned her. RP (Nov. 2, 2012) at 482. J. did identify Mulamba as the "guy who hurt me" and identified Mulamba in court. *Id.* at 477. When asked where the "mark" on her leg was from (referring to the burn scars), J. responded they came from Mulamba "spanking" her. *Id.* at 478. However, when asked what her "mommy's name" was, J. responded with her foster mother's name. *Id.* at 472. When directly asked if she knew "who Ashley is" J. responded, "No." *Id.* Additionally, when asked if Eli ever hit her, J. responded, "I don't remember." *Id.* at 481. When asked if Eli ever tied a bandana around her mouth, J. responded, "No," even though Eli testified to doing exactly that. *Id.*; RP (Oct. 31, 2012) at 114.

[11] S. testified that Mulamba threatened S. with the iron on different occasions but never burned him. RP (Nov. 2, 2012) at 440, 448, 456.

17

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

Additionally, Mulamba testified that he did not cause any of "the serious injuries"—he caused only bruising. *Id.* at 994.

The scientific evidence did not prove that Mulamba committed those most serious injuries, either. The DNA test of the iron that was found in Mulamba's home had both Mulamba's and J.'s DNA on it, but Eli could not be excluded as a contributor of the DNA. *Id.* at 988, 995.

Eli, however, explicitly testified that she did not cause the burns, Mulamba did. RP (Oct. 31, 2012) at 107-08.[12]

Thus, Eli was the State's most critical witness. Her testimony was the only evidence linking Mulamba to J.'s burns.

As discussed above, the defense was certainly able to impeach Eli at trial. The defense in *Gregory* was also able to impeach the principal rape witness at trial, using far more impeachment evidence than the defense had in this case. This court nevertheless reversed the conviction in *Gregory* because the complainant was such an important witness and the suppressed evidence would have added to the doubtfulness of her testimony. 158 Wn.2d at 799-800 (key witness's recent lie to law enforcement was material, even though that witness was already impeached with prior convictions). Following *Gregory*, the undisclosed jail records in this

_____

[12] Both Mulamba and Eli said that they did not see the other person burn J., they just assumed the other must have done it. *Id.* at 189, 993.

18

*In re Pers. Restraint of Mulamba (Reuben Denis)*, No. 99403-0
(Gordon McCloud, J., dissenting)

case are also favorable, exculpatory, and, of most importance, material. The State's failure to disclose them to the defense "'undermines confidence in the outcome of the trial.'" *Kyles,* 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

CONCLUSION

Eli was the critical witness who testified that Mulamba inflicted the injuries supporting the charge of assault of a child in the first degree. Her credibility was highly disputed. The jail records provided recent, verifiable evidence showing her bias and undermining her ability to accurately perceive, recall, and relate information. I agree with the majority that these jail records were favorable to Mulamba and that the State had a duty to disclose them. But I disagree with its conclusion that the jail records were not material.

I therefore respectfully dissent.

_____
Gordon McCloud, J.

19